### GEORGETOWN UNIVERSITY, Petitioner,

v.

### DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.

### Bernie Ford, Intervenor.

### No. 07–AA–1258.

District of Columbia Court of Appeals.

Argued Jan. 28, 2009.
Decided May 14, 2009.

Jeffrey W. Ochsman, with whom Todd S. Sapiro, Washington, DC, was on the brief, for petitioner.

Pastell Vann, Senior Assistant Attorney General, and Peter J. Nickles, Interim Attorney General for the District of Columbia at the time the statement was filed, and Todd S. Kim, Solicitor General, and

Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief, for respondent.

Matthew J. Peffer, Greenbelt, MD, argued for intervenor.

Heather C. Leslie, was on the brief, for intervenor.

Before BLACKBURNE–RIGSBY and THOMPSON, Associate Judges, and BELSON, Senior Judge.

BELSON, Senior Judge:

In this petition for review of a decision and order of the Compensation Review Board ("CRB") of the District of Columbia Department of Employment Services ("DOES"), petitioner Georgetown University ("Georgetown") asks this court to vacate the agency's order granting intervenor Bernie Ford ("Ford") temporary total disability benefits and remand the case for reconsideration. We hold that the CRB has not adequately explained its rationale for granting temporary total disability benefits. We discuss the portions of the compensation order we deem inadequate in order to assist the agency in clarifying its decision upon remand. We vacate the compensation order, and remand the case to DOES for further proceedings consistent with this opinion.

**I.**

Georgetown employed intervenor Ford as a communications and dispatch patrol officer. On August 7, 2005, while on duty in the security and communications office at the Georgetown University Law Center, Ford left the office to use the restroom. On the way back from the restroom, he fell backward, twisting his left knee, hitting his head, and causing the handcuffs he was carrying to cut into his lower back.

Ford was promptly taken to the emergency room at the Georgetown University Hospital, received inpatient treatment at the Virginia Hospital Center one week later, and also underwent an MRI scan on August 15, 2005, that revealed a strain of the left knee. Ford sought treatment in late August 2005 from Dr. Fredric Salter, who diagnosed Ford with an acute lumbosacral strain and left knee contusion, prescribed physical therapy and restricted Ford from returning to work. Dr. Salter also referred Ford to a neurosurgeon, Dr. Bruce Ammerman, who concluded that Ford showed "posttraumatic cervical and lumbar radiculopathy secondary to the 08–07–05 fall."

Dr. Salter released Ford to light-duty employment beginning on February 20, 2006, but Ford instead returned to full duty on that date. Georgetown paid temporary total disability benefits through February 3, 2006, but refused to pay benefits for the two weeks thereafter. Ford filed a claim with DOES for temporary total disability benefits from February 4 to February 19, 2006, as well as the cost of a myelogram, and continuing medical treatment related to his injury.

The parties participated in a full evidentiary hearing before an Administrative Law Judge ("ALJ") on April 11, 2007. Ford testified that as he was coming back from the bathroom, "somebody opened the door" and there was "water on the floor" which he then slipped on. Ford further testified that prior to slipping he felt no unsteadiness in his left leg. Ford testified that he radioed for someone to "come mop the floor and put a wet floor sign," which, Ford said, Georgetown subsequently did.

Georgetown argued at the hearing that Ford was not entitled to temporary total disability benefits from February 4 through February 19, 2006, because (I) Ford's testimony that he slipped on water was not credible, and (ii) his fall resulted

from his knee's giving way due to an idiopathic injury.[1] The evidence showed that Ford had experienced a series of workplace injuries beginning in 1998, and had reported continuing knee and back pain since that time. Ford had surgery on his left knee in 1998, and again on June 15, 2005. Ford had also sought treatment in 2004 for what he described as upper back pain.

Georgetown impeached Ford in an attempt to show that he did not slip on water, but rather fell because his knee gave out due to a pre-existing knee condition. Georgetown introduced Ford's treatment notes from his stay at the Virginia Hospital Center. Those treatment notes, dated August 14, 2005, state that Ford reported recently having left-knee surgery and, referring to his fall at issue of August 7, 2005, that he fell on his back due to "unsteadiness on knee." Georgetown introduced medical records which indicated that Ford's left knee had given way on previous occasions, and also gave way again in November 2005, approximately three months after his fall at Georgetown.

Georgetown introduced a July 19, 2000, treatment record in which Ford had reported that he "fell when his left knee gave way." Ford testified at the hearing that the July 2000 and November 2005 incidents concerned his right knee. Georgetown also presented a document from April 2004 in which Ford reported that he had been experiencing pain in the "low back and legs ... with some giving way of the leg since that time." Ford denied that his leg gave way in April 2004, and generally denied having problems with his knee giving way.

The ALJ also heard expert medical evidence as to whether Ford's leg, back and headache symptoms following his August 7, 2005, fall were causally related to that fall or to his pre-existing medical problems. Ford introduced treatment reports showing that his lumbar pain was causally related to the fall. Georgetown introduced the report of an independent medical examiner indicating that the fall caused Ford "no additional internal derangement," and thus that his disability was not a product of his fall.[2]

1. Because this court has not explored the so-called "idiopathic fall doctrine," or even employed the phrase, we must look elsewhere for a definition. Idiopathic is defined as "peculiar to the individual" or "arising spontaneously or from an obscure or unknown cause." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1123 (2002). Courts distinguish between idiopathic injuries and injuries with unknown causes. An idiopathic fall has been characterized as "one resulting from some disease or infirmity that is strictly personal to the employee and unrelated to his employment." *Ledbetter v. Michigan Carton Co.*, 74 Mich. App. 330, 253 N.W.2d 753, 754 (1977); *see Miyamoto v. Wahiawa Gen. Hosp.*, 101 Hawai'i 293, 67 P.3d 792, 799 (Ct.App.2003) (distinguishing between idiopathic and unexplained falls); 1 LARSON'S WORKERS' COMPENSATION LAW, § 9.01[1] (rev. ed. 2008). Larson suggests that "a majority of the courts agree" that a fall of idiopathic origin is compensable where the "employment ... contribute[s]

something to the hazard of the fall." *Id.* § 9.01[4][d]. Larson, however, also states that a "distinct majority of jurisdictions ... have ... denied compensation" in cases of falls from level ground due to idiopathic physical conditions of the employee. *Id.* § 9.01[4][a].

2. The report of the independent medical examiner, Dr. Marc Danziger, continued: "Even from the history provided throughout the multiple notes, I even have some question of whether the 8/7/05 injury was really a work related injury secondary to the slip on water or really more related to the 6/15/05 surgery and subsequent giving way episode, which would make it completely unrelated to his work status." He also opined that he did not "find any significant exacerbation throughout the notes I have read that the 8/7/05 injury caused any additional trauma to the neck or back, especially in light of his normal MRI scans other than the post-surgical changes in the back."

The ALJ issued her compensation order on August 31, 2007. In her findings of fact, the ALJ found that Ford "*slipped and fell* on his way back to his duty station after visiting the restroom . . . twisting his left knee" and suffering a "deep cut in his low back." The ALJ then acknowledged Ford's history of falls due to "back/leg weakness," and considered Georgetown's position that Ford's "predisposition to falling negates . . . [its] liability for the consequences of the fall at work." The ALJ then assessed whether Ford's accident arose out of and in the course of employment. The ALJ concluded as follows:

> In this case, there is evidence to invoke the presumption [of compensability] in the record testimony and medical evidence. Claimant's testimony describes slipping on water at work. *Even if he did not slip on water,* he was in the process of walking back to his duty station from the restroom; walking, standing, climbing, etc. are required activities for a campus police officer, and any of those activities has the potential to result in injury from a fall.

(Emphasis added.) The ALJ found that Ford had "adduced evidence . . . to show that his described employment activities (specifically, walking back to his duty post from the restroom) *either caused or significantly contributed to his fall . . . .*" (emphasis added). On the basis of this evidence, the ALJ concluded that Ford was entitled to a rebuttable presumption that his injury arose out of and in the course of employment and was compensable.

The ALJ next examined whether there existed a medical causal relationship between Ford's fall and his knee and back conditions. The ALJ concluded that Georgetown had presented evidence that Ford's disability was unrelated to his August 2005 fall sufficient to rebut the presumption of medical causation. The ALJ then weighed the medical evidence without the benefit of the presumption. The ALJ concluded that Georgetown's evidence did not "persuasively contradict the existence of a causal connection between claimant's fall at work and his left knee and low back condition, which worsened after the fall." Accordingly, the ALJ granted Ford temporary total disability benefits for the period in question.

Georgetown thereafter appealed the ALJ's compensation order to the CRB. Georgetown maintained that, because Ford's testimony that he slipped and fell on water was not credible, substantial evidence supported the contrary finding that Ford's pre-existing knee condition (and its tendency to cause Ford's knee to give out), rather than any aspect of his employment, caused the fall. The CRB found that the ALJ properly concluded that Ford had invoked the presumption of compensability because Ford's "employment activities 'specifically walking back to his duty post from the restroom' either caused or significantly contributed to the fall. . . ." The CRB found no error in the ALJ's determination that Georgetown had rebutted the statutory presumption of a causal relationship between Ford's fall and his knee and back condition, but agreed with the ALJ that the medical evidence supported such a causal link. The CRB then voiced its disagreement with Georgetown's position that "idiopathic falls are generally not compensable," but in its holding parried that issue, stating that "an employee's disability is compensable if it arose 'even in part' out of the course of his employment."

## II.

In its petition for review, Georgetown argues that there is not substantial evidence that supports the agency's finding that Ford slipped and fell on water at the workplace, and that the ALJ erred in fail-

ing to explain why she credited Ford's account of his accident. Rather, Georgetown contends, the evidence showed that Ford fell when his left knee gave out, an idiopathic, non-compensable fall unrelated to a workplace event or condition.

Although Georgetown urges us to examine whether the ALJ erred in failing to explain why she credited Ford's version of events over his apparently conflicting medical records, we do not reach that issue. Rather, we vacate the CRB's compensation order on other grounds. First, the agency leaves this court to guess as to the basis for its decision to award benefits. Second, the CRB's examination of whether Ford's fall arose out of and in the course of his employment is too perfunctory to warrant deference by this court. Third, because the order lacks the necessary clarity, we cannot be sure that the agency applied the workers' compensation statute's burden-shifting scheme properly.

**1. Standard of Review**

 This court reviews DOES decisions to determine whether they are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001). We affirm an administrative agency decision when (1) the agency made findings of fact on each contested material factual issue, (2) substantial evidence supports each finding, and (3) the agency's conclusions of law flow rationally from its findings of fact. *Perkins v. District of Columbia Dep't of Employment Servs.*, 482 A.2d 401, 402 (D.C.1984). "[W]e do not 'affirm an administrative determination which reflects a misconception of the relevant law or a faulty application of the law.'" *Berkley v. D.C. Transit, Inc.*, 950 A.2d 749, 759 (D.C. 2008) (quoting *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 169 (D.C.1979)). Further, this court "cannot

affirm an agency decision if we cannot confidently ascertain either the precise legal principles on which the agency relied or its underlying factual determinations." *Id.* (internal quotation marks omitted).

 "As the agency recognized as having special competence to decide matters within its expertise," DOES "is entrusted in the first instance with responsibility to interpret" the Workers' Compensation Act. *Teamsters Local Union 1714 v. Public Employee Relations Bd.*, 579 A.2d 706, 710 (D.C.1990) (internal citations and quotation marks omitted). While this court will "give considerable deference to an administrative agency's interpretation of a statute that it administers ... and will uphold that interpretation unless it is plainly erroneous or inconsistent with the enabling statute," where the agency did not conduct any analysis of a statutory provision we will not accord its interpretation substantial weight. *Proctor v. District of Columbia Dep't of Employment Servs.*, 737 A.2d 534, 538 (D.C.1999) (internal citations and quotation marks omitted). "Ordinarily ... this court will not attempt to interpret the agency's statute until the agency itself has done so. Instead, we will remand to permit the agency to engage in the necessary analysis of the legislation it is charged with carrying out." *King v. District of Columbia Dep't of Employment Servs.*, 742 A.2d 460, 466 (D.C.1999) (internal citations and quotation marks omitted).

**2. Statutory Scheme**

 To show that an injury is compensable, the employee must "establish that the work event or condition at issue was the cause of the claimed injury," that is, that the injury is in fact work-related. *Sturgis v. District of Columbia Dep't of Employment Servs.*, 629 A.2d 547, 553

(D.C.1993). An accidental injury is compensable under the Workers' Compensation Act if it "aris[es] out of and in the course of employment." D.C.Code § 32–1501(12). Because the statute is remedial in nature, it affords the claimant a presumption that the injury constitutes a compensable workplace injury. *Ferreira v. District of Columbia Dep't of Employment Servs.*, 531 A.2d 651, 655 (D.C.1987). To raise the statutory presumption of compensability, a claimant must make an "initial demonstration" of "both an injury and a relationship between that injury and the employment." *Georgetown Univ. v. District of Columbia Dep't of Employment Servs.*, 830 A.2d 865, 870 (D.C.2003); *Ferreira, supra,* 531 A.2d at 655.

"The presumption then operates to establish a causal connection between the disability and the work-related event, activity, or requirement." *Clark v. District of Columbia Dep't of Employment Servs.*, 743 A.2d 722, 728 (D.C.2000) (quoting *Ferreira, supra,* 531 A.2d at 655). In other words, the statute creates a two-pronged presumption that (I) the event causing (or contributing to) the disability arose out of and in the course of employment, and (ii) that a medical causal relationship exists between the claimed disability and a work-related event. *McCamey v. District of Columbia Dep't. of Employment Servs.*, 947 A.2d 1191, 1197 n. 3, 1199 (D.C.2008) (en banc); *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 926 A.2d 140, 145 n. 5, 148 (D.C.2007); *McNeal v. District of Columbia Dep't of Employment Servs.*, 917 A.2d 652, 658 (D.C.2007). If the employer proffers substantial evidence to rebut the presumption, then the presumption drops out of the case entirely, and the burden reverts to the claimant to prove his entitlement to benefits by the preponderance of the evidence. *McNeal, supra,* 917 A.2d at

656; *Washington Post v. District of Columbia Dep't of Employment Servs.*, 852 A.2d 909, 911 (D.C.2004).

In cases where an employee's injury arises neither out of a risk directly associated with employment nor out of a risk personal to the employee, this court has employed the positional risk doctrine, explaining that an employee's injury arises out of his employment "so long as it would not have happened *but for* the fact that conditions and obligations of the employment placed claimant in a position where he was injured." *Clark, supra,* 743 A.2d at 727 (citing *Grayson v. District of Columbia Dep't of Employment Servs.*, 516 A.2d 909, 911 & n. 4 (D.C.1986) (emphasis in original)). We have added that:

> This theory supports compensation, for example, in cases of stray bullets, roving lunatics, and other situations in which the only connection of the employment with the injury is that its obligations placed the employee in the particular place at the particular time when he or she was injured by some neutral force, meaning by "neutral" neither personal to the claimant nor distinctly associated with the employment. On the other hand, "when it is clear that the employment contributed nothing to the episode, ... [the episode and resulting injury] should be held noncompensable even in states fully accepting the positional risk test, since that test applies only when the risk is 'neutral.'"

*Id.* (citing 1 LARSON, *supra* note 1, §§ 3.05, 8.02[1][c] (1999)). We discuss below the particular role that a positional risk analysis might play in the analysis of Ford's claim for workers' compensation.

### 3. Discussion

*(a) We Cannot Ascertain the Basis on Which the Agency Granted Benefits*

Considering the CRB's compensation order together with the ALJ's deci-

sion, the former can be read to adopt either of two bases for awarding benefits. In her findings of fact, the ALJ found that Ford "slipped and fell on his way back to his duty station after visiting the restroom at work." Then, in addressing whether Ford had invoked the presumption of compensability, she concluded he had done so in part because Ford testified that he "slipp[ed] on water at work." Yet, in the next sentence, the ALJ stated that "[e]ven if [Ford] did not slip on water," the presumption applied because he was engaged in work duties at the time of the accident (i.e., walking or standing). The CRB incorporated the ALJ's factual findings and analysis into its compensation order, affirming both.

The ALJ's finding that Ford slipped can be read as an implied rejection of Georgetown's contention that Ford's knee gave out.[3] Thus, we are unsure what the ALJ meant in the next section when she stated that Ford's fall arose out his work duties "[e]ven if he did not slip on water." The statement might mean either that (I) consistent with her findings of fact, Ford slipped on the floor or on some substance other than water, or more likely, that (ii) whether he slipped, or whether his knee gave out on account of a pre-existing knee condition, the fact that he was walking or standing at the time (and thus performing the work duties of a campus police officer) requires the conclusion that his fall arose out of and in the course of his employment. The CRB failed to clarify the compensation order, reiterating instead the ALJ's less-than-clear analysis.

 "The orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *Long v. District of Columbia Dep't of Employment Servs.*, 570 A.2d 301, 305 (D.C.1990) (internal quotation marks omitted). We cannot be sure if we are being asked to evaluate the propriety of an agency's determination that Ford experienced a slip and fall on the job that was a compensable workplace injury, or instead, the quite different conclusion that Ford's fall, however caused and even if partially-or even wholly-idiopathic in origin, arose from his work duties. We cannot perform our appellate review function where we are unable to ascertain confidently the basis for the agency's order. *Id.*

*(b) Even if the Agency Determined that Ford Suffered a Compensable Idiopathic Fall, That Conclusion is Not Entitled to Deference*

 Even if we were confident that the CRB had found that Ford's injury arose out of and in the course of his employment, though it resulted from an idiopathic fall on level ground, we could not affirm the compensation order.

The CRB explained that "[i]t is well settled in this jurisdiction that an employee's disability is compensable if it arose 'even in part' out of the course of his employment." This statement both obscures the appropriate inquiry (which is whether Ford's fall arose at all out of and in the course of his employment), and constitutes too meager an explanation of its

---

3. For a definition of "slip," see MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1173 (11th ed. 2005) ("to slide on or down a slippery surface"), or AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1677 (3d ed. 1992) (including among meanings of to *slip* "[to] slide involuntarily and lose one's balance or foothold"). Ford's counsel at oral argument agreed, noting that "if your leg gives out ... causing the fall, then *that* would be the finding."

decision to warrant this court's deference.[1] *See Capital Hilton Hotel v. District of Columbia Dep't of Employment Servs.*, 565 A.2d 981, 985 (D.C.1989) (distinguishing between requirements that injury arise *out of* and in *the course of* employment). Whether an employee who experiences a fall to level ground at the workplace due to an idiopathic cause (such as a knee giving way, heart attack, fainting episode, epileptic attack, etc.) suffers a compensable workplace injury has remained an open question in this jurisdiction.

The United States Court of Appeals for the District of Columbia Circuit, construing the "arising out of" language of the Longshore and Harbor Workers' Compensation Act,[5]indicated that it "makes no difference that the [claimant] was exposed to no more than the ordinary hazards of living and working, or that the same kind of injury might have occurred wherever he might have been." *Wheatley v. Adler*, 132 U.S.App. D.C. 177, 407 F.2d 307, 311 (1968) (en banc).[6]

Even taking into account the generous gloss this jurisdiction has given to the critical "arising out of" language, the facts of the instant case go beyond even those of our precedents, including *Wheatley*, where the agency heard evidence that an employee suffered a heart attack while urinating outdoors on a cold day. *Id.* at 309–13.[7] We note that other jurisdictions take conflicting approaches to compensability in the somewhat similar situation of idiopathic falls from level ground, and that Larson acknowledges that a "distinct majority of jurisdictions ... have ... denied compensation" in such cases. 1 LARSON, *supra* note 1, § 9.01[4][a].[8]

4. It can hardly be disputed that Ford's fall occurred during "the course of" his employment.

5. "Before 1980, persons employed in the District of Columbia were covered by workers' compensation under the Longshoremen's and Harbor Workers' Compensation Act." *Pannell–Pringle v. District of Columbia Dep't of Employment Servs.*, 806 A.2d 209, 211–12 (D.C.2002). "D.C. Circuit cases interpreting provisions of the Longshoreman's Act provide persuasive authority in interpreting virtually identical provisions of the Workers' Compensation Act." *Grayson, supra,* 516 A.2d at 911 n. 2 (citing *Dunston v. District of Columbia Dep't of Employment Servs.,* 509 A.2d 109, 111 n. 2 (D.C.1986)). Here, 33 U.S.C. § 902(2) (2006), defining injury under the Longshore and Harbor Workers' Compensation Act, is virtually identical to D.C.Code § 32–1501(12). Congress amended the Act in 1984, substituting "Longshore" for "Longshoremen's." Longshore and Harbor Workers' Compensation Act Amendments of 1984, Pub.L. No. 98–426, 98 Stat. 1639.

6. The *Wheatley* court continued that "the statutory presumption [of the Longshoremen's and Harbor Workers' Compensation Act] brings within the Act a death that results in the course of employment when a pre-existing internal disorder takes a sudden turn for the worse, unless the record contains substantial evidence as to the cause of the collapse *which shows that it was not aggravated or precipitated by a work-related factor.*" *Wheatley, supra,* 407 F.2d at 312 (emphasis added). We have also said that the fact that an injury occurs "in the 'course of employment,' ... strengthens the presumption that it 'arises out of' the employment." *Dunston, supra* note 5, 509 A.2d at 111.

7. *Wheatley* dealt with a claimant who suffered a heart attack while urinating outdoors on a cold day after choosing to go outside to do so rather than climb up, with a handicap to one leg, "a number of steps and across the building to the bathroom in the back [of the workshop]." *Wheatley, supra,* 407 F.2d at 311.

8. *Compare Cypress Creek Nursery v. Eagle,* 547 So.2d 136 (Fla.1989) (finding that where claimant's knee suddenly buckled while standing on the job, injury was idiopathic and did not arise out of employment), *Chaparral Boats, Inc. v. Heath,* 269 Ga.App. 339, 606 S.E.2d 567, 571–72, 574 (2004) (injury did not arise out of employment where employee was walking to clock in to job and knee hyperextended), *Harris v. Ohio Bureau of Workers' Comp.,* 117 Ohio App.3d 103, 690

In light of the absence of decisions by this court addressing whether idiopathic falls from level ground *arise out of* employment, and given the stated basis for the CRB's decision, it would have been appropriate for the CRB to discuss the analytic framework it used to come to its determination.[9] It may well be that, without using that terminology, the CRB employed a positional-risk analysis in making its decision. *See Georgetown, supra,* 830 A.2d at 872; *Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.,* 821 A.2d 898, 901 (D.C.2003) (describing and applying the positional-risk standard); *Clark, supra,* 743 A.2d at 727 (same). The basis for the CRB's apparent rejection of petitioner Georgetown's position that idiopathic falls (which would include, as here, falls from level ground) may not be compensable is not self-evident, and absent meaningful analysis or articulation of the legal principles on which its statement rested, the CRB's cursory application of the Workers' Compensation Act is not one to which we are prepared to defer. *See Teamsters Local Union 1714, supra,* 579 A.2d at 710–11.

In sum, without suggesting what specific findings of fact should be made on the existing record in this case, we observe that there are essentially three crucial findings of fact that this record might be found to support. The first is that Ford slipped and fell solely because he stepped in water on the floor. If that in fact occurred, the resulting injuries would be compensable. *See Ferreira, supra,* 531 A.2d at 656 (unexpected injury incurred during the course of work, though not specifically traumatic or particularized, may be compensable). The second is that Ford fell because of a combination of his idiopathic pre-existing leg condition and the presence of water on the floor where he stepped. In that event also, his resulting injuries would be compensable. *See Spartin v. District of Columbia Dep't of Employment Servs.,* 584 A.2d 564, 570, n. 9 (D.C.1990) ("[A] worker's compensation claimant need not prove that his employment was the sole cause of his disability."); *cf. Shelton v. Ennis Bus. Forms, Inc.,* 1 Va.App. 53, 334 S.E.2d 297, 299 (1985) ("Under the 'two causes' rule if a disability has two causes, one related to employment and one unrelated, benefits are allowed."); 1 LARSON, *supra* note 1, § 4.04 ("The law does not weigh the relative importance of the two causes ... it merely inquires whether the employment was a contributing factor. If it was, the concurrence of the personal cause will not defeat compensability.") The third is that Ford fell

N.E.2d 19, 20 (1996) (where claimant suffered a seizure while on duty and fell, injuring himself, injury from fall was not compensable), *and Nu–Way Laundry & Cleaners v. Palmer,* 12 Ark.App. 31, 670 S.W.2d 464 (1984) (where claimant testified that she fell when she slipped on water, but Commission found fall resulted from pre-existing knee condition causing it to give way, compensation award reversed), *with Lovett v. Gore Newspapers Co.,* 419 So.2d 306 (Fla.1982) (level fall compensable because work conditions—requirement that claimant work overtime on tiled concrete floor—constituted a "special and increased hazard" to claimant, and thus it was not as likely that she would have sustained the same injury at home).

9. As authority for its apparent rejection of Georgetown's claim that idiopathic falls are not compensable, the CRB emphasized that "an aggravation of a pre-existing condition may constitute a compensable accidental injury." We agree that it may. *Jackson v. District of Columbia Dep't of Employment Servs.,* 955 A.2d 728, 734–35 (D.C.2008). The question in this case is not, however, whether the aggravation of a pre-existing injury is compensable under the statute, but rather whether the aggravating incident can be deemed to have arisen out of and in the course of Ford's employment.

not because of the presence of water or some other substance on the floor, but fell because of his idiopathic condition, the unsoundness of his left leg, a risk personal to him. In that circumstance, a resulting injury would not be compensable unless it is concluded, with a reasoned explication of the positional risk doctrine, that the doctrine extends so far as to require compensation.[10] *See, e.g., Svehla v. Beverly Enterprises,* 5 Neb.App. 765, 567 N.W.2d 582, 590–91 (1997) ("The 'unexplained fall rule,' even if deemed a corollary to the positional risk doctrine … is not applicable when there is evidence of a possible idiopathic origin to the fall."); *Indian Leasing Co. v. Turbyfill,* 577 S.W.2d 24, 27–28 (Ky.Ct. App.1978) ("Liability under the positional risk theory for idiopathic falls is limited to those cases in which the employment placed the employee in a position increasing the dangerous effects of the idiopathic fall.... In level fall cases involving no increased danger attributable to the employment, liability may be imposed on the employer only if the work was a substantial factor in causing the injury.").

*(c) Remand is Necessary Also to Permit the Agency to Clarify How it Applied the Statute's Burden Shifting Scheme*

■ Finally, we note two portions of the compensation order in which the agency has not adequately explained its application of the burden shifting called for under the Workers' Compensation Act. Accordingly, we cannot be confident that the agency has applied the statute correctly.

Having first found that Georgetown had rebutted the presumption of a medical causal relationship between Ford's fall and his knee and low back condition, the ALJ went on to conclude that Georgetown's medical evidence did "not persuasively contradict the existence of [such] a causal connection." The CRB approved and restated this analysis. We have made clear, however, that where the employer rebuts the presumption of a medical causal relationship, the burden reverts to the claimant to prove that relationship by the preponderance of the evidence. *See McNeal, supra,* 917 A.2d at 658; *Washington Post, supra,* 852 A.2d at 911; *Washington Hosp. Ctr. v. District of Columbia Dep't of Employment Servs.,* 744 A.2d 992, 998 (D.C. 2000). We cannot be confident that the ALJ's statement that Georgetown's evidence did not "persuasively contradict" the existence of a causal relationship appropriately placed the burden of persuasion on Ford, as opposed to requiring Georgetown to carry the burden of proving the absence of a causal link. *See Washington Hosp. Ctr., supra,* 744 A.2d at 1000 (remand to allow agency to correct misapplication of statutory burden).

We also address another problematic aspect of the agency's treatment of the statute's burden-shifting scheme. The ALJ correctly recognized that the statute affords a claimant a rebuttable presumption that the injury both (i) arose out of, and in the course of, employment, and (ii) that a medical causal relationship exists between the workplace event and the disability. *McCamey, supra,* 947 A.2d at 1197 n. 3; *Washington Metro. Area Transit Auth., supra,* 926 A.2d at 145 n. 5, 148; *McNeal,*

---

10. Larson notes that "[a]ll risks causing injury to a claimant can be brought within three categories: risks distinctly associated with the employment, risks personal to the claimant, and 'neutral' risks—i.e., risks having no particular employment or personal character. Harms from the first are universally compensable. Those from the second are universally noncompensable." 1 Larson, *supra* note 1, § 4. As set forth in footnote 1, *supra*, an idiopathic fall has been characterized as one resulting from some disease or infirmity that is strictly personal to the employee and unrelated to his employment.

*supra,* 917 A.2d at 658. Georgetown offered evidence to rebut both aspects of the presumption. That is to say, it presented evidence tending to suggest that Ford's symptoms were unrelated to his August 7, 2005, fall, *and* that his fall resulted from an idiopathic condition rather than from a condition or obligation of employment. *Georgetown, supra,* 830 A.2d at 872 (discussing positional-risk standard). Yet, the ALJ found that Georgetown had rebutted "the statutory presumption," and re-weighed the evidence as to the existence of a medical causal relationship between Ford's symptoms and the accident, but did not re-weigh the evidence as to whether his injury *arose out of and* in the course of his employment.[11] *See Ferreira, supra,* 531 A.2d at 655 (once presumption is triggered, burden is on employer to show by substantial evidence that injury did not arise out of and in the course of employment). The agency may have simply overlooked the need to re-weigh the evidence relevant to whether the injury arose out of the employment, or it may have concluded that Georgetown had failed to rebut that presumption *either* because Ford's injury was compensable despite an idiopathic cause, *or* because Georgetown's evidence was too insubstantial to rebut Ford's testimony that he slipped on water. We cannot tell which. Unfortunately, the CRB's compensation order fails to elucidate the ALJ's analysis.

Because this court has the responsibility of making sure the agency has taken a "hard look" at the issues in this case, the court may not be left to guess at the agency's findings or its reasoning. *The Washington Times v. District of Columbia Dep't of Employment Servs.,* 724 A.2d 1212, 1221 (D.C.1999) (citations omitted);

*Gordon v. District of Columbia Unemployment Comp. Bd.,* 402 A.2d 1251, 1258 (D.C.1979). Given the lack of clarity in the CRB's compensation order, we cannot be confident that the agency has correctly applied the Act's burden-shifting scheme.

### III.

In summary, we find the CRB's compensation order inadequate for the reasons identified above. We therefore vacate the compensation order and remand the case to the agency for proceedings consistent with this opinion, including a remand to the Administrative Hearings Division for such further fact finding as the CRB deems necessary.

*So ordered.*

---

11. The agency has on previous occasions considered whether the employer produced substantial evidence to rebut the presumption that claimant's injury arose out of employment. *See Spartin v. District of Columbia Dep't of Employment Servs.,* 584 A.2d 564, 572 (D.C.1990) (describing Director's decision weighing the evidence).